UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

BORDER FAIR HOUSING AND
ECONOMIC JUSTICE CENTER

        Plaintiff,

v.

JL GRAY COMPANY, INC., and
KEVIN SMITH

        Defendants.

Case No. _____

**COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF AND DAMAGES**

**NATURE OF THE ACTION**

1. This action for declaratory judgment, injunctive relief, and damages challenges Defendants' discrimination on the basis of religion in the provision of housing. This action arises under the Fair Housing Act of 1968, as amended, 42 U.S.C. § 3601, *et seq.*; and the Municipal Code of the City of Las Cruces, § 13-61, *et seq.*

2. Plaintiff Border Fair Housing and Economic Justice Center ("Border Fair Housing") combats discrimination that limits housing opportunities in the border regions of the Southwestern United States. It maintains a multi-faceted program that includes education and outreach, counseling and advocacy, best practice initiatives, community development, research and planning, and enforcement of civil rights and consumer protection laws.

3. Border Fair Housing was contacted in July 2006 by a tenant at Desert Palms Apartments ("Desert Palms"), one of the few affordable housing communities in

the area of Las Cruces, New Mexico.  The tenant complained of religious discrimination at Desert Palms by Defendant Kevin Smith.  Mr. Smith supervised the onsite managers of Desert Palms and other housing communities as a Regional Manager for Defendant JL Gray Company, which owns, develops, and/or manages many affordable housing complexes in the Southwestern United States.  Mr. Smith is also the pastor of a small branch of a church called "Life's Purpose Church."  He founded the Life's Purpose Church branch with his wife, who was JL Gray's onsite manager for another Las Cruces affordable housing community until recently.

4. In response to the religious discrimination complaint, Border Fair Housing conducted an extensive investigation of JL Gray's management and operation of Desert Palms.

5. Border Fair Housing learned that Mr. Smith used his position as Regional Manager for JL Gray to benefit supporters of his Life's Purpose Church and to punish non-supporters.  He provided housing preferences and services to tenants and prospective tenants of Desert Palms who attended his church, while withholding preferences and services from those who refused to attend.  Specifically, Mr. Smith discriminated by:  (a) conditioning approval of at least one tenant's apartment application on her agreement to attend his church; (b) providing maintenance and rodent control to tenants who attended his church while withholding these services from other tenants who did not attend his church; (c) allowing tenants who attended his church to pay their rent late without penalty while charging late fees to other tenants who did not attend his church; (d) allowing tenants who attended his church to skip rent payments while threatening to evict other tenants who did not attend his church for non-payment of rent, including tenants who

had, in fact, paid their rent; (e) using the Desert Palms community room to conduct services for his church while denying or restricting access to the room by tenants who wished to use it for other purposes but who did not attend his church; (f) allowing tenants who attended his church to violate the Desert Palms pet policy while telling other tenants who did not attend his church that they could not keep documented service animals; and (g) charging tenants who did not attend his church with rules violations they did not commit.  Mr. Smith retaliated against tenants who did not attend his church and who complained to or spoke with Border Fair Housing about these discriminatory actions.

6. Mr. Smith also retaliated against the Desert Palms onsite manager who cooperated with Border Fair Housing's investigation.  He fired her one or two days after she met with Border Fair Housing and its attorneys.  In addition to losing her job, she no longer lives in the Desert Palms apartment she received as part of her compensation.  Mr. Smith also told tenants that she embezzled thousands of dollars from Desert Palms.  Upon information and belief, this allegation was false.

7. Tenants and employees informed JL Gray of many of Mr. Smith's unlawful actions both before and after Border Fair Housing first received a complaint.

8. The day after a meeting between Border Fair Housing's executive director and JL Gray officials in early-December 2006, and as a direct result of that meeting, JL Gray terminated Mr. Smith's employment.

9. By their actions, JL Gray and Kevin Smith have frustrated Border Fair Housing's mission of promoting equal opportunity in housing, interfered with its efforts to promote equal opportunity in housing, and caused it to commit scarce resources to identify and counteract Defendants' discriminatory conduct.

## PARTIES

10. Plaintiff Border Fair Housing and Economic Justice Center is a not-for-profit corporation organized under the laws of Texas. It maintains an office at 1050 Monte Vista Avenue, Las Cruces, New Mexico 88001.

11. Border Fair Housing was founded in 2004 by community leaders living in the Southwestern United States border region who recognized that rampant inequities and discrimination were severely limiting housing opportunities for minorities in the area. Border Fair Housing adopted a mission to promote fair housing, equal access to credit, economic justice, the development of decent and affordable housing, community development, and the expansion of small business opportunities in communities throughout the border region of the Southwestern United States. In pursuit of that mission, Border Fair Housing, in partnership with other public and private entities and organizations, maintains a multi-faceted program that includes education and outreach, counseling and advocacy, best practice initiatives, community development, research and planning, and enforcement of civil rights and consumer protection laws.

12. Border Fair Housing's public-information projects have increased awareness of fair housing issues and generated numerous telephone calls from individuals who have a variety of needs regarding fair housing opportunities. Many of these individuals complain of housing discrimination. In response, Border Fair Housing investigates the complaints by, for example, conducting interviews and tests. Border Fair Housing has received multiple complaints regarding discrimination based on religion at Desert Palms. Border Fair Housing has been, and continues to be, adversely affected by the acts, policies, and practices of the Defendants.

13. Defendant JL Gray Company, Inc. is a for-profit company organized under the laws of New Mexico. JL Gray is engaged in the business of acquiring, developing, and managing affordable multi-family residential communities in the Southwestern region of the United States. It developed and manages Desert Palms. Its principal place of business for development is located in Las Cruces, New Mexico and its principal place of business for management is located at 420 West Elm Street, Farmington, New Mexico 87401. JL Gray is vicariously liable for the acts and/or omissions of its agents and employees. At all times relevant to the allegations in this Complaint, JL Gray acted through its agents and employees.

14. Defendant Kevin Smith resides at 2995 Fountain Avenue, Las Cruces, NM 88007. Defendant was a regional manager for JL Gray until early-December 2006, with oversight responsibility for the management of numerous multi-family apartment buildings including Desert Palms.

## JURISDICTION AND VENUE

15. This Court has jurisdiction over this matter pursuant to 42 U.S.C. § 3613(a), 28 U.S.C. § 1331, 28 U.S.C. § 1343, 28 U.S.C. § 1367, and 28 U.S.C. § 2201.

16. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because the events or omissions giving rise to the claims occurred in New Mexico and the Defendants reside in New Mexico.

## FACTUAL BACKGROUND

**A.     JL Gray's Management of Desert Palms Apartments**

17. Desert Palms is a 101-unit apartment complex in Las Cruces, New Mexico that was developed with federal Low Income Housing Tax Credit funds. Desert Palms

5

continues to be operated under the requirements of the Low Income Housing Tax Credit program, which requires that the rents at Desert Palms be kept affordable for low- and moderate-income families in the area.

18. Desert Palms is managed by JL Gray, which has developed, owns, or manages numerous apartment complexes throughout the Southwestern United States. Upon information and belief, JL Gray employs regional managers who oversee the operations of multiple apartment buildings owned and/or managed by JL Gray.

19. All or most of the apartment buildings managed by JL Gray have onsite managers who are supervised by the regional managers. Until early-December 2006, Kevin Smith was a Regional Manager responsible for approximately fifteen JL Gray-managed apartment buildings, including Desert Palms. Mr. Smith supervised the onsite managers at the apartment buildings in his region, including Mesquite Village Apartments where his wife was the onsite manager until recently.

**B. Kevin Smith's "Life's Purpose Church"**

20. Mr. Smith is the pastor of a small branch of a church called "Life's Purpose Church." He and his wife are the co-founders of the church.

21. Until approximately late-July 2006, the Life's Purpose Church held services up to three times a week in the community room at Desert Palms. During that time period, Mr. Smith did not allow any non-church use of the community room or greatly restricted such use. The church subsequently held services at Mesquite Village Apartments.

22. Mr. Smith seeks to recruit new members for his church primarily from economically disadvantaged neighborhoods. Mr. Smith focuses his proselytizing on poor

young women with children and frequently suggests that their husbands or boyfriends are not welcome. In his efforts to recruit members, Mr. Smith makes promises of food and clothing for the women and their children.

23. Mr. Smith regularly proselytizes at JL Gray apartment buildings, including at Desert Palms. Mr. Smith and other church members regularly distribute church flyers and information door-to-door at JL Gray apartment buildings and tell tenants to attend his church. Mr. Smith and other church members regularly leave church information on Desert Palms tenants' doors.

24. Mr. Smith conducted church business during substantial periods of time while he was supposed to be performing his duties as regional manager.

### C. Border Fair Housing's Investigation of Discrimination at Desert Palms

25. Border Fair Housing received a complaint in July 2006 from a Desert Palms tenant who believes that Kevin Smith discriminated against her on the basis of her religion. The tenant did not have difficulties with Mr. Smith until she declined several invitations from him to attend his church. He then began to treat her poorly, restricted her use of the parking lot during church services, and gave her a baseless eviction notice.

26. Border Fair Housing began an investigation of the allegations. It interviewed many current and former tenants of Desert Palms and other apartment communities within Mr. Smith's region. It interviewed current and former employees and/or agents of JL Gray. Border Fair Housing conducted extensive research regarding Desert Palms and JL Gray. It also counseled tenants facing eviction and referred tenants to other direct service providers.

27. Border Fair Housing and their representatives contacted JL Gray and its counsel to discuss the discriminatory conduct, address JL Gray's fair housing obligations, and to ensure the conduct ceased and would not be repeated.

**D.    Mr. Smith's Discriminatory and Retaliatory Conduct**

28. Mr. Smith's discrimination has taken many forms. The common thread is that Mr. Smith used his position as Regional Manager to provide housing-related benefits to religious supporters who attended his church, and to punish non-supporters by withholding these benefits and otherwise subjecting them to mistreatment.

29. Mr. Smith likewise used his position to retaliate against tenants and employees who opposed his discrimination, and to retaliate against tenants and employees who aided and encouraged others in opposing his discrimination.

30. Prior to and after Border Fair Housing first received a complaint about Mr. Smith, tenants and employees informed Mr. Smith's supervisors at JL Gray of Mr. Smith's intermingling of his roles as Regional Manager and leader of the Life's Purpose Church. His supervisors were informed of Mr. Smith's differential treatment of tenants based on whether or not they attended his church. They took no actions to prevent Mr. Smith from continuing these activities until early-December 2006.

**1.    Discriminatory Review of Apartment Applications**

31. On at least one occasion, Mr. Smith explicitly linked approval of a prospective tenant's application for an apartment at Desert Palms to her agreement to attend his church.

32. The prospective tenant was living in a rundown and poorly maintained long-term residence hotel in Las Cruces, New Mexico. Mr. Smith had frequently visited the hotel and offered free bags of groceries to women if they would attend his church.

33. The prospective tenant satisfied the eligibility requirements for renting an apartment at Desert Palms and applied for one. She went to the management office on or about May 26, 2006, to check on the status of her application. The onsite manager said that the application was still pending because her supervisor, Mr. Smith, had not reviewed it yet. Mr. Smith was in the office, however, and the onsite manager raised the matter with him.

34. Mr. Smith began to talk about his church. He then told the applicant that there are "ways to get around waiting lists" and that he would approve her application if she would agree to come to the church. She was not interested in the church but, to have an apartment to live in, said that she would attend. Mr. Smith approved her application immediately and she moved in within days.

35. Mr. Smith frequently discussed religion and his church with other actual and potential apartment applicants. Mr. Smith spoke to these individuals about the benefits of his religion and the failings of other religions including Catholicism. Mr. Smith has disparaged Catholics and recently asked supporters to offer daily prayers "to break down the walls of Catholicism in [Las Cruces]."

### 2. Discriminatory Eviction and Threats of Eviction

36. For several months, Mr. Smith did not serve nonpayment or eviction notices on, or begin eviction proceedings against, a Desert Palms tenant who attended his church and repeatedly failed to pay rent.

37. Tenants who do not attend the church and missed rent payments promptly received eviction notices.

38. Eviction notices for nonpayment of rent were also delivered to a number of tenants who timely paid their rent but do not attend the church.

39. Mr. Smith told a pregnant tenant who was complaining to him about an allegedly improper notice of eviction for nonpayment of rent that it would be good for her baby if she started attending his church, implicitly suggesting that he would rescind the notice in exchange for her attendance.

### 3. Discriminatory Application of Security Deposit Policy

40. Desert Palms tenants are required to pay a security deposit equal to one month's rent before occupying their apartments.

41. Mr. Smith waived or reduced this requirement for a number of tenants who attend his church.

42. Mr. Smith has not waived or reduced this requirement for tenants who do not attend his church.

### 4. Discriminatory Assessment of Late Fees

43. Desert Palms tenants are required to make rent payments at the beginning of each month.

44. Mr. Smith often waived late fees for tenants who attend his church and did not make timely rent payments.

45. Mr. Smith did not similarly waive late fees for tenants who do not attend his church.

### 5. Discriminatory Provision of Maintenance and Rodent Control

46. Tenants at Desert Palms suffer many maintenance and rodent control problems that affect their health and safety. These problems include broken air conditioners, broken refrigerators, inadequate locks, water under carpets, other water damage, worn out air conditioner filters, cockroaches, mice, and rats.

47. The maintenance and rodent problems of tenants who attend the Life's Purpose Church are addressed promptly.

48. Tenants who do not attend the church experience serious difficulties in obtaining satisfactory responses to their complaints about the same issues.

49. A Desert Palms maintenance worker told tenants that if they attended Mr. Smith's church, their maintenance and rodent problems would be addressed sooner.

### 6. Discriminatory Access to Community Room

50. At Mr. Smith's direction, the Life's Purpose Church held services in the Desert Palms community room up to three times a week until approximately late-July 2006. A number of tenants attended the services.

51. Mr. Smith did not permit tenants to use the community room for other purposes, or greatly restricted their access to the room.

52. Upon information and belief, Mr. Smith followed these same practices at Mesquite Village Apartments when he moved church services to that property. Mr. Smith's wife was the onsite manager of Mesquite Village until recently.

### 7. Discriminatory Application of Rules

53. Desert Palms does not allow or significantly restricts pets in the building. Mr. Smith allowed at least one tenant who attends his church to violate this rule.

54. Tenants who do not attend the church were not permitted to violate this rule. This includes at least one tenant with a documented need for a service animal.

55. A number of tenants who do not attend Mr. Smith's church received notices of other rule violations that they did not commit. Rules violations can lead to eviction.

56. Upon information and belief, tenants who do attend the church did not receive baseless notices of rules violations.

### 8. Retaliation Against Tenants Who Opposed Discrimination

57. Mr. Smith learned about Border Fair Housing's investigation in approximately August 2006. He demonstrated his anger with the investigation and his willingness to retaliate by saying that anybody who sued him would be sorry because he would get even.

58. Mr. Smith subjected Desert Palms tenants who complained to Border Fair Housing about discrimination or cooperated with Border Fair Housing's investigation to the same types of mistreatment described above. For example, Mr. Smith reviewed the Desert Palms file of the tenant who first complained to Border Fair Housing about his discriminatory actions in search of an excuse to evict her.

59. Similarly, a number of tenants met with Border Fair Housing and its attorneys on September 6, 2006, regarding their rights under the fair housing laws. Upon information and belief, Mr. Smith promptly learned of this meeting. Within days, tenants who were seeking assistance from Border Fair Housing received letters threatening eviction for non-payment of rent. Some or all of the tenants had timely paid their rent. The letters referred to prior "3 Day Pay or Quit" notices that the tenants had not received.

### 9. Retaliation Against the Onsite Manager for Aiding and Encouraging Tenants Who Opposed Discrimination

60. The Desert Palms onsite manager cooperated with and assisted Border Fair Housing's investigation of discrimination at Desert Palms. She also aided and encouraged tenants who sought assistance from Border Fair Housing in opposing Mr. Smith's discrimination. In August 2006, Mr. Smith told her that he did not want her to cooperate with Border Fair Housing and began to impose harsher terms and conditions upon her.

61. The onsite manager participated in the September 6, 2006 meeting with Border Fair Housing and counsel. In retaliation, Mr. Smith fired the onsite manager one or two days later. As a result, she no longer lives in the Desert Palms apartment that was a benefit of her employment.

62. On or about the same day, Mr. Smith started telling Desert Palms tenants that the onsite manager had embezzled money from Desert Palms. On or about the same day, Mr. Smith tried to procure statements from Desert Palms tenants incriminating the onsite manager. He offered free rent and to forego eviction proceedings against tenants in exchange for a written statement that the tenant had paid his or her rent to the onsite manager in cash.

63. Mr. Smith also granted preferential treatment to other employees/agents of JL Gray who attend his church and penalized employees/agents who do not.

### INJURY TO PLAINTIFF

64. Defendants' unlawful actions have frustrated Border Fair Housing's mission of promoting fair housing and non-discrimination in housing throughout the border region in the Southwestern United States. Border Fair Housing has made

substantial efforts and expended considerable resources to ensure equal housing opportunities without regard to religion. Defendants' discriminatory practices at Desert Palms have impeded Border Fair Housing's efforts to ensure equal housing opportunities without regard to religion.

65. Defendants' unlawful actions have forced Border Fair Housing to divert its resources from its typical activities, which include a range of educational, testing, investigative, counseling, and referral services throughout the greater Las Cruces metropolitan area.

66. Instead of engaging in these usual activities, Border Fair Housing has been forced to identify and counteract Defendants' discriminatory practices by, among other activities: investigating Defendants' discrimination; testing and monitoring Defendants' compliance with fair housing laws; gathering information; and communicating with Defendants regarding their fair housing obligations.

67. Border Fair Housing has devoted time, resources, and money toward efforts to educate the public and raise community awareness regarding discrimination in housing based on religion in an effort to offset the effect of Defendants' unlawful practices and actions and refusal to change those unlawful practices and actions.

68. Border Fair Housing had planned to implement various projects and initiatives in and around the summer and fall of 2006. The time and resources diverted to investigate and counteract Defendants' discrimination contributed to the delay in implementing those projects and initiatives.

69. Defendants' unlawful actions described above were, and are, intentional and willful, and/or have been and are implemented with callous and reckless disregard for the statutorily protected rights of Plaintiff.

70. Unless enjoined, Defendants will continue to engage in the illegal activities described above.

## FIRST CAUSE OF ACTION
(Federal Fair Housing Act)

71. Plaintiff repeats and incorporates by reference all allegations contained in Paragraphs 1 through 70 as if fully set forth herein and further allege as follows.

72. Defendants' acts, including those through its agents and employees, as described herein, violate the Fair Housing Act, as amended, 42 U.S.C. §§ 3604(a), (b), (c), and (d), and § 3617.

(a) Defendants' acts, as described above, constitute a refusal to negotiate for the rental of housing and made housing unavailable on the basis of religion in violation of 42 U.S.C. § 3604(a);

(b) Defendants' acts, as described above, provided different terms, conditions, and privileges in the rental of housing, as well as different services and facilities in connection therewith, on the basis of religion in violation of 42 U.S.C. § 3604(b);

(c) Defendants' statements, as described above, indicate a preference, limitation, and/or discrimination on the basis of religion in violation of 42 U.S.C. § 3604(c);

15

(d)     Defendants, as described above, made misrepresentations regarding the availability of housing on the basis of religion in violation of 42 U.S.C. § 3604(d).

(e)     Defendants' acts, as described above, constitute coercion, intimidation, threat, and/or interference in the exercise and enjoyment of rights protected by 42 U.S.C. § 3604 of the Federal Fair Housing Act, and on account of having aided or encouraged another in the exercise of such rights, in violation of 42 U.S.C. § 3617.

## SECOND CAUSE OF ACTION
(City of Las Cruces Fair Housing Municipal Code)

73.     Plaintiff repeats and incorporates by reference all allegations contained in Paragraphs 1 through 72 as if fully set forth herein and further allege as follows:

74.     Defendants' acts, including those through its agents and employees, as described herein, violate the City of Las Cruces Municipal Code §§ 13-65(1), (2), (3), (4), and (9).

(a)     Defendants' acts, as described above, constitute a refusal to negotiate for the rental of housing and made housing unavailable on the basis of religion in violation of City of Las Cruces Municipal Code § 13-65(1);

(b)     Defendants' acts, as described above, provided different terms, conditions, and privileges in the rental of housing, as well as different services and facilities in connection therewith, on the basis of religion in violation of City of Las Cruces Municipal Code § 13-65(2);

    (c)  Defendants' statements, as described above, indicate a preference, limitation, and/or discrimination on the basis of religion in violation of City of Las Cruces Municipal Code § 13-65(3);

    (d)  Defendants, as described above, made misrepresentations regarding the availability of housing on the basis of religion in violation of City of Las Cruces Municipal Code § 13-65(4);

    (e)  Defendants' acts, as described above, constitute coercion, intimidation, threat, and/or interference in the exercise and enjoyment of rights protected by Article III of Chapter 13 of the City of Las Cruces Municipal Code, and on account of having aided or encouraged another in the exercise of such rights, in violation of City of Las Cruces Municipal Code § 13-65(9).

### DEMAND FOR JURY TRIAL

  Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury of all issues so triable as of right.

### PRAYER FOR RELIEF

  WHEREFORE, Plaintiff respectfully prays that the Court grant the following relief:

  (1)  enter a declaratory judgment finding that the foregoing actions of the Defendants violate the Fair Housing Act of 1968, as amended, 42 U.S.C. § 3601, *et seq.*, and the Municipal Code of the City of Las Cruces, § 13-61, *et seq.*;

  (2)  enter a permanent injunction directing the Defendants and their directors, officers, agents and employees to take all affirmative steps necessary to remedy the

effects of the illegal, discriminatory conduct described herein and to prevent similar occurrences in the future;

(3) award compensatory damages to Plaintiff in an amount to be determined by the jury that would fully compensate Plaintiff for its economic loss, diversion of resources, and frustration of mission that has been caused by the conduct of the Defendants alleged herein;

(4) award punitive damages to Plaintiff in an amount to be determined by the jury that would punish the Defendants for the willful, wanton and reckless conduct alleged herein and that would effectively deter similar conduct in the future;

(5) award Plaintiff its reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 3613(c)(2); and

(6) order such other relief as this Court deems just and equitable.

Dated: January 31, 2007

 /s/ Reed N. Colfax_____
Reed N. Colfax (N.M. Fed. Bar No. 98-31)
John P. Relman
Glenn Schlactus
RELMAN & ASSOCIATES
1225 19th Street NW, Suite 600
Washington, DC 20036
(202) 728-1888
(202) 728-0848 (fax)
rcolfax@relmanlaw.com
*Attorneys for Plaintiffs*